H. Newton Whittelsey, Inc., Petitioner, *v.* Commissioner of Internal Revenue, Respondent.

Docket No. 8642.   Promulgated October 15, 1947.

*Max Rockmore, Esq.,* and *Sidney Meyers, Esq.,* for the petitioner. *Clay C. Holmes, Esq.,* for the respondent.

OPINION.

Arnold, *Judge*: The principal issue in this case is whether petitioner qualifies as a personal service corporation under section 725 (a) of the Internal Revenue Code, which is set forth in the margin.[1]  Respondent concedes that petitioner is qualified thereunder to the extent of stock ownership by the principal shareholders and to the extent that capital is not a material income-producing factor in petitioner's business.  In the light of this concession we need discuss only whether the income of the corporation is to be ascribed primarily to the activities of shareholders who are regularly engaged in the active conduct of the affairs of the corporation.

On this point respondent contends that nonstockholder employees of the petitioner contributed so substantially to the services rendered by petitioner that personal service classification must be denied, citing Regulations 112, section 35.725–2.  Respondent admits that Whittelsey secured the contracts and was the final cog in supervision of the work performed thereunder, but he contends that this is not enough to qualify petitioner as a personal service corporation.  Petitioner, he says, relied upon nonstockholders to do a substantial amount of the work which produced the income, and their work was predominant and greatly overshadowed the contribution by Whittelsey.

The crux of this issue is whether petitioner's income is to be ascribed primarily to the activities of Whittelsey and the other stockholders. Basically, this means Whittelsey, who, under section 725 (a), is con-

---

[1] SEC. 725. PERSONAL SERVICE CORPORATIONS.  [Added by § 301, Second 1940 Act; amended by § 223, 1942 Act.]

(a) DEFINITION.—As used in this subchapter, the term "personal service corporation" means a corporation whose income is to be ascribed primarily to the activities of shareholders who are regularly engaged in the active conduct of the affairs of the corporation and are the owners at all times during the taxable year of at least 70 per centum in value of each class of stock of the corporation, and in which capital is not a material income-producing factor; but does not include any foreign corporation, nor any corporation 50 per centum or more of whose gross income consists of gains, profits, or income derived from trading as a principal.  For the purposes of this subsection, an individual shall be considered as owning, at any time, the stock owned at such time by his spouse or minor child or by any guardian or trustee representing them.

sidered the owner of stock standing in his wife's name. None of the other stockholders had the scientific knowledge, skill, education, experience, and contacts requisite to secure or perform the contracts. In these particulars petitioner was essentially a one-man corporation, wholly dependent upon Whittelsey. He made all the business contacts, he secured all of petitioner's contracts, he provided the necessary architectural and marine engineering experience, he was the only man in petitioner's organization who could estimate the cost of performing the cost-plus contracts and petitioner's fees, and its income depended heavily upon the accuracy and correctness of his estimates. He scheduled the time of performance of the work and completion of the contracts, he supervised the work done under the contracts, he worked out the innumerable changes demanded by the Navy during the course of the performance of the contracts, and he directed and integrated the overall operation so that the shipyards would have the complete working plans necessary for the continuous construction of sub-chasers and mine sweepers for use by the Navy. Whatever portion of the petitioner's income is to be ascribed to these factors must be ascribed *entirely* and not just *primarily* to the activities and efforts of Whittelsey.

The contributions made by most of petitioner's nonstockholder employees were minor in character. The work of its office personnel, i. e., junior clerks, junior accountants or bookkeepers, stenographers, messengers, etc., was primarily clerical in nature and could not be said to be a material income-producing factor. The tracer-trainee employees merely inked in the drawings prepared by the draftsmen, squad leaders, and division and department heads. The importance of their work is indicated by their average salary of $813 per annum, no allowance being made for labor turnover. Their work required no exercise of judgment or discretion and entitled them to no higher status than petitioner's office personnel. The different grades of draftsmen prepared drawings in accordance with the work assigned to them by the division heads or chiefs of the departments. Draftsmen were told what was to be done and were supervised by the employees over them. Only the more experienced draftsmen were capable of making suggestions and doing original design work. The squad leaders coordinated the work of the sections under them and kept the work moving as scheduled. The division heads assigned the work and, with the chief of the department, kept the work of their department on schedule and coordinated the work of the other departments. The chiefs conferred with Whittelsey, received instructions from him, made suggestions to him for approval or rejection, and, with their assistants, the division heads, operated their departments. None of them was qualified to perform Whittelsey's multiple activities, and

all of them relied upon Whittelsey for direction, instruction, and supervision.

Some measure of the importance of the various classifications of employees may be gained from the average annual salaries paid. The chiefs of the three departments received about $7,411 each. The division heads averaged $4,613 and the squad leaders $3,607. There were no changes during the taxable year in the three departmental chiefs and it is unlikely, but not established, that there were changes in the division heads. There may have been some turnover in the squad leaders, which would not be reflected in their average annual salaries. There were changes in the draftsmen employed and their average salaries were probably in excess of the amounts indicated by the table showing a breakdown of employees and total wages paid exclusive of overtime. For the three grades of draftsmen, senior, regular, and junior, the average annual salaries were $1,664, $1,612, and $1,491, respectively. The testimony shows that of all these employees only about fifteen were qualified to make suggestions regarding the drawings and specifications. The inference we draw from these facts is that the employees were constantly directed and instructed with respect to their drawing board assignments and, with few exceptions, did no original drawings or designing under the contracts performed during the taxable year. Any original work and all supervised work had to receive the approval of the employee's immediate supervisor and the approval of Whittelsey, who was the final authority on all drawings, plans, and specifications.

Considerable emphasis has been laid by respondent upon the completeness of the "type plans" or "outline plans" and specifications furnished the petitioner by the Navy. The record indicates that the Navy provided petitioner with 14 outline plans and an 80-page list of Navy requirements. Whittelsey interpreted these plans and specifications and developed them in minute detail in accordance with the Navy's general specifications and requirements. He worked into the detailed plans the changes made from time to time by the Navy and yet kept within the original design and overall requirements for the construction of sub-chasers and mine sweepers. The location of specialized equipment, machinery, power equipment, and all the innumerable items required by a ship at sea called for the exercise of his special skills and judgment, due to their effect on the speed, displacement, functional purpose, operation, seaworthiness, and other qualities that the Navy wanted built into the vessels. The engines, motors, and special equipment were acquired from the manufacturers and petitioner did no designing work thereon. But the matter of installation, strengthening of structural ship members to support heavy machinery, the location on the ship, and the relationship to other machinery and

equipment so as to acquire maximum utility and performance were all matters for Whittelsey's special talents and ability. It was his responsibility to so plan the ship with its machinery and equipment that the Navy would secure maximum efficiency in operation under all conditions. Architectural ability and marine engineering skill were both necessary to visualize, design, and produce the detailed drawings of the ships ordered by the Navy and furnished with specialized equipment for the jobs that the sub-chasers and mine sweepers were to perform. It is clear from this record that Whittelsey was the only person in petitioner's organization who could and did render these highly specialized personal services. It is equally clear that in the limited time that he had to perform the job, Whittelsey had to, and did, rely upon employees who were supervised, directed, and instructed by him. The detailed drawings the employees produced were at his direction. In spite of the large number of employees working under him, we are of the opinion that petitioner's income is to be ascribed primarily to his activities. Almost any of petitioner's employees could have been replaced without harm to the scheduled production of the drawings, but it is quite obvious from this record that petitioner could neither have secured nor performed the contracts without Whittelsey.

We have examined with interest the cases cited by the parties. In one of the earliest cases on this question, *Bryant & Stratton Commercial School, Inc.*, 1 B. T. A. 32, it was pointed out that the statutory definition precluded any definitive classification and required the application of a flexible judgment to the facts in each case. The taxpayer in that case employed 27 to 30 teachers, who worked under the supervision of the two principal stockholders. The latter laid out all of the courses of instruction, supervised it, and to some extent actually gave instruction. Incidental income was derived by the school from the sale of school books and supplies and from the rental of 200 typewriters. Nevertheless, it was held that the taxpayer was a personal service corporation, the income of which was attributable primarily to the activities of its two principal stockholders.

Respondent relies upon our decision in *Patterson-Andress Co.*, 6 B. T. A. 392, and *Continental Accounting & Audit Co.*, 7 B. T. A. 330. In the *Patterson-Andress* case we said, p. 398:

* * * During these same years [1919 and 1920] the corporation paid to some fifteen, twenty or more employees, who were not stockholders, $39,500 and $60,000, respectively, amounts almost as great as those distributable to the stockholders. We know nothing of the services performed by these employees, except that one was art director and two others did lettering upon the advertisements. In our opinion it can not be said that in such circumstances the income is to be attributed primarily to the activities of the stockholders. They secured the clients—it was to their experience and guidance that clients looked, but the performance of the

duties undertaken, from the time of the first step to the checking and preparation of a statement of the proper charges for advertising, required the services of an organization which outnumbered the stockholders by six or seven to one. We do not mean to hold that personal service classification must be denied in all cases where there are employees under the supervision of stockholders, but where, as here, employees so greatly outnumber the stockholders and there is no evidence of the character of the service performed by most of them and they receive substantially one half of the earnings over the expenses other than salary, we can not find that the income is to be ascribed primarily to the activities of the stockholders. In our opinion this clause means more than that the stockholders shall obtain the clients and supervise the work, or that clients shall look to their experience; it means, among other things, that the corporation may not rely upon non-stockholders to do a substantial amount of the work which produces the income whether such work be detailed or supervisory. Just as another clause excludes from personal service classification those corporations where capital contributes materially to the income, so does this clause exclude corporations where the services of employees so contribute.

Subsequent decisions by this Court and the appellate courts have granted personal service classification even though there were a number of employees, where "the services of such employees were of a subordinate character not productive of income primarily." *H. S. Jaudon Engineering Co.*, 15 B. T. A. 161, 167; *MacMartin Advertising Agency, Inc.*, 11 B. T. A. 162; *Williamson & Rauers Co.*, 12 B. T. A. 476; *Sweeney & James Co.*, 10 B. T. A. 966; *Botsford-Constantine & Tyler*, 10 B. T. A. 565; *Cocks-Clark Engraving Co.*, 8 B. T. A. 468; *Fuller & Smith* v. *Routzahn*, 23 Fed. (2d) 959. In the latter case the Circuit Court, in discussing the purpose of the statute, stated:

* * * The law was directed at absentee stock ownership. If the service rendered is in the nature of personal service and is rendered by the owners of the business, the law intended a separate classification for income and excess profits taxes. It was intended to give corporations performing services of this nature and in this manner the same tax position as a partnership. The dominating purpose was to distinguish between corporations engaged in trade, merchandising, and manufacturing, in which much capital is required, and without which profits may not be earned, and corporations performing personal services, in which large capital is not usually required or necessary to its efficient conduct. The discrimination is between income earned by capital and income earned by personal effort. * * *

We think this record demonstrates that the income here was earned by personal services. Petitioner was not engaged in trade, merchandising, or manufacturing. Capital was not required or necessary for the efficient conduct of its business. The Navy contracted for the professional services and engineering skill of the petitioner. The services sought and the engineering skill desired were Whittelsey's. The employees, while numerous, were assistants of more or less experience working under Whittelsey's directions. The presence of numerous employees is not necessarily fatal to petitioner's contention, as shown by the cases hereinafter discussed. *George B. Ricaby Co.* v. *Nauts,*

19 Fed. (2d) 271; see also *George B. Ricaby Co.*, 1 B. T. A. 512, in which the taxpayer had as many as 75 real estate salesmen, three branch managers, 7 to 15 brokerage salesmen, a sales manager, and an office force of 12 to 17 people. The Board denied personal service classification, but the Circuit Court allowed such classification. In *Fuller & Smith, supra,* the taxpayer had telephone operators, clerks, stenographers, bookkeepers, office boys, artists, and a research director, and it contracted for work with outside artists. The number of employees is undisclosed, but the point was made that, except for the research director, the duties performed were purely clerical or minor. In *H. K. McCann Co.*, 14 B. T. A. 251, personal service classification was granted a taxpayer that employed 245 persons and averaged 145 persons during the taxable years. The salaries paid nonstockholding employees was in excess of $278,000, as compared with salaries paid stockholders of over $66,000. We there found that the service assistants were capable efficient men whose functions were to handle routine matters in the service of clients and to relieve the stockholder in charge of the account of such duties as he could delegate to them in order that he might devote his time to other phases of the advertising service. In *Carter MacDonald & Miller, Inc.*, 14 B. T. A. 522, in granting personal service classification to the taxpayer, we stated, p. 527:

The law does not require that the principal stockholders should personally perform all the various functions included in the service performed, and the employment of clerks, stenographers, salesmen and others to perform detail duties does not deprive a corporation of the right to personal service classification. * * *

In *F. Merges & Co.*, 11 B. T. A. 444, the taxpayer, a one-man corporation with 60 employees and approximately 300 local agents, was granted personal service classification. In *Honig-Cooper Co.*, 11 B. T. A. 896, the regular employees outnumbered the stockholders 13 to 1, but personal service classification was granted.

In view of the foregoing discussion of authorities and the facts and circumstances of this case, it is our opinion that the income of the petitioner is to be ascribed primarily to the activities of H. Newton Whittelsey. The petitioner, having met the tests laid down by the statute, is entitled to personal service classification.

The second issue is whether petitioner, a taxpayer on the cash receipts and disbursements basis, is entitled to deduct a so-called reserve for vacation allowances amounting to $3,458.90. Actually this sum had been earned by petitioner's employees, but, due to the pressure of work, they had been unable to get the time off for vacation, and petitioner had not paid out the $3,458.90 to them. Under its method of accounting petitioner is entitled to deduct this sum only when paid out or disbursed. It can not account for and report

income partly on the accrual and partly on the cash basis. *Massachusetts Mutual Life Insurance Co.* v. *United States*, 288 U. S. 269; *Bennett Properties Co.*, 45 B. T. A. 696; *Fred W. Leadbetter*, 39 B. T. A. 629. On this issue we hold for the respondent.

The final issue is petitioner's right to deductions, totaling $90, which it claimed on its return as contributions. It is conceded that the organizations to which these payments were made do not qualify as charitable organizations. Petitioner now urges that the amounts represent ordinary and necessary expenses for advertising in the publications of these organizations. We find no testimony to the effect that this was the purpose of the expenditures. In the absence of proof establishing that the amounts represented advertising expense, we must approve the respondent's determination.

Reviewed by the Court.

*Decision will be entered under Rule 50.*

---

DISNEY, *J.*, dissenting: Findings of fact in this case disclose that wages, including overtime, plus compensation for officers, totaled approximately $354,000, of which only about $39,000 was compensation for officers. H. Newton Whittelsey was president. To his efforts and ability the majority opinion, in effect, primarily ascribes the earnings of the corporation, and therefore concludes that it is a personal service corporation. I note, however, that the three department chiefs, the three division heads, and the seven squad leaders included employees who were paid approximately $61,000, as against about $39,000 to the officers, including Whittelsey. It therefore appears that the corporation considered its officers to be earning much less than the leaders of its employees. The $39,000 is about 11 per cent of the $354,000 paid employees and officers. It is impossible for me, in the light of these figures, reflecting the attitude of the corporation in valuing the services of its officers, including Whittelsey, to conclude that the corporate income is "to be ascribed primarily to the activities of its principal stockholder," Whittelsey. The record does not show the amount of compensation paid to him alone, but, assuming that it is far the larger portion of the $39,000 paid to all officers, it still is a very small percentage of the total amount paid to employees. The attitude of the corporation, thus definitely proved towards compensation of its president and other officers, it seems to me, is a better indication of the importance of his activities than the record otherwise shows. I think the importance of employees is not to be so minimized as the majority opinion holds. This is not a case, therefore, where I believe there is a personal service corporation. I therefore dissent.