J. E. Purdy Company, Inc. v. Commissioner.
J. E. Purdy Co. v. Commissioner
Docket No. 24360.
United States Tax Court
1953 Tax Ct. Memo LEXIS 187; 12 T.C.M. (CCH) 766; T.C.M. (RIA) 53235; June 30, 1953
*187 Corporation engaged in portrait photography, held, exempt as a personal service corporation as denied in Sec. 725, I.R.C.Trout-Ware, Inc., 11 T.C. 505, followed. Samuel S. Dennis, 3d, Esq., and C. Keefe Hurley, Esq., for the petitioner. Melvin L. Sears, Esq., for the respondent. HARRON Memorandum Findings of Fact and Opinion The Commissioner determined a deficiency in excess profits tax for 1943 in the amount of $53,438.30. He also determined overassessments for 1943 of income tax and of declared value excess profits tax in the amounts of $27,277.34, and $271.15, respectively. The sole issue is whether the petitioner is entitled to be classified as a personal service corporation under the provisions of section 725 of the Internal Revenue Code. Findings of Fact The petitioner, a corporation, filed its returns for 1943 with the collector for the district of Massachusetts. During the taxable year, and prior thereto, the petitioner's business was carried on in Boston, Massachusetts. Petitioner was organized under the laws of Massachusetts in January, 1934, by Stanley B. Purdy, George G. Corregan, Jr., and Jennie Laing. *188 Stanley Purdy is the son of J. E. Purdy, deceased, who died in 1937 at the age of 74 years. J. E. Purdy carried on a portrait photograph business in Boston from about 1895 until the time of his death. Stanley Purdy and George Corregan were employed by J. E. Purdy in the latter's business. The petitioner's application for articles of incorporation stated as one of the purposes of incorporation that it proposed to carry on the photograph business owned for many years by J. E. Purdy, deceased. Petitioner acquired certain assets from the estate of J. E. Purdy, deceased, in exchange for its stock. It acquired equipment which had an original cost of $4,000, and furniture and fixtures which had an original cost of $3,000. Petitioner began its business with cash in the amount of $1,280. It borrowed $5,000 from the estate of J. E. Purdy. Petitioner's authorized stock is 250 shares of common stock having a par value of $100 per share. During 1943, 70 per cent in value of petitioner's stock was owned throughout the year by Purdy, Corregan, and Corregan's wife. All of petitioner's stock was owned by the following persons: Stanley Purdy, 100 shares; Frances P. Black (Purdy's sister), 74 shares; *189 George Corregan, Jr., 50 shares; Eva Corregan, 25 shares; Jennie Laing, 1 share. During 1943, and since the time of organization, petitioner's officers were as follows: President and treasurer, Stanley Purdy; vice-president and general manager, George Corregan, Jr. Throughout 1943, Purdy and Corregan devoted all of their time to the conduct of petitioner's business; they were regularly engaged in the active conduct of the affairs of the petitioner's corporation. Both Purdy and Corregan know the portrait photograph business completely. Purdy began work in that business in 1901, and Corregan started to work in the same business in 1923. Both were trained by and worked for J. E. Purdy, deceased. Corregan is a photographer and he knows the techniques of taking quality photographs, such as lighting, exposure, posing, background, and composition. He has taught other photographers employed by petitioner the techniques which Corregan and Purdy require in petitioner's business. Corregan also knows the processes of developing negatives in the darkroom, and how to correct errors in taking and making quality portraits. He is experienced in dealing with customers, and in all of the aspects *190 of managing and operating a portrait photography business. Prior to 1934, Corregan had a great deal of experience in obtaining photography business, and he specialized in getting the photography business of schools. Purdy knows thoroughly and is capable of doing all the technical and artistic procedures followed in the printing of finished photographs from negatives. The chief service of Purdy in the conduct of petitioner's business in 1943 was to supervise the quality of proofs and finished prints. Purdy, also, during 1943, looked after the accounting records of petitioner, and payrolls. Purdy is not a photographer. During 1943, Corregan was responsible for obtaining petitioner's chief business, that is to say, about 80 per cent thereof, which came fromabout 150 schools. He contacted schools, obtaining their business. He had built up petitioner's original school business, and he had made the original contacts with 90 per cent of the schools which gave their photograph business to petitioner in 1943. Because the photograph business is competitive, it is necessary to go to schools each year about prospective work. In 1943, Corregan made such re-contacts himself. He was assisted, *191 however, by two men whom he had trained, one of whom worked only part time for Corregan during 1943. Corregan directed his two business contact assistants in their work during 1943. Corregan was responsible for petitioner's first business contacts. In 1943, the volume of school photograph business increased greatly. It was a war year and many schools adopted an accelerated program, graduating two classes a year. Because Corregan and his assistants under his direction obtained the business of schools in 1943, the volume of petitioner's business from taking photographs of the individual members of graduating classes increased. Petitioner had other business in 1943, making portraits of individuals - men and women - of people in uniform, of brides, of children, and babies. Many people in uniform came to petitioner because, previously, while in school, Corregan had taken or made the arrangements for taking their school photographs. In addition to getting business for petitioner, Corregan, during 1943, took photographs, supervised the hired photographers and trained them, and he supervised the work of others who developed and printed pictures. Corregan controlled the quality of photography. *192 He and Purdy supervised the quality of all photographs before they were finished and delivered. Corregan also made large layouts of individual photographs of individuals who belonged to a class of a school, or some other group. He did both the composition, or layout, arranging, and the lettering of the name under each photograph in the group. He trimmed and mounted photographs for group layouts. Corregan met clients and decided which photographer should take a picture, if he did not. He discussed problems with clients. Corregan took care of the advertising which petitioner did, and that was part of his work in getting new business. He prepared advertising copy. Corregan instructed and criticized the hired cameramen-photographers so as to obtain quality pictures. He checked the procedures followed in the laboratory and darkroom where pictures were developed. He worked long hours, from 7:30 A.M. to 9:30 P.M. on weekdays, and from 7:30 A.M. to 6:00 P.M. on Saturdays; and he frequently worked on Sunday from 9:00 A.M. to 4:00 P.M. Purdy regularly spent every afternoon, and frequently evenings, inspecting up to 50 per cent of all proofs and finished portraits. He controlled the quality *193 of the developing and finishing. He examined proofs for proper or improper exposure and lighting, and proper or improper development of negatives. He advised Corregan and the employees about defects and corrections to be made. He advised about the proper chemical solutions to be used in developing negatives. Purdy examined up to 50 per cent of all retouching. Corregan and the head printer also examined retouching. Some of the retouching was done on a contract basis outside petitioner's studio by persons who had been trained in petitioner's studio. Petitioner's officers had some of the retouching done on the outside to reduce petitioner's work in connection with Social Security taxes. Purdy had an office from which he had a full view of the reception office. He observed how clients were received. He discussed corrections of proofs with clients, advising about the corrections which should be made by retouching. Purdy worked long hours. He regularly worked each day from 8:45 A.M. to 5:00 P.M., and he frequently worked until 9:00 P.M. in the evening. He devoted every morning to the business routines of petitioner's studio, the keeping of books of account, and the making up of the *194 weekly payroll. Purdy and Corregan emphasized the artistic quality to be obtained in portrait photographs as the standard to which employees working under their supervision should conform. The correct use of lights and shadows determined the artistic quality of a portrait photograph, and its style. Purdy and Corregan exercised constant supervision over all of petitioner's employees. The value of and the compensation charged for the services of petitioner's skilled employees were attributable to the skill and supervision of Purdy and Corregan. All phases of petitioner's business, obtaining clients, giving them personal service, producing artistic photographs of a high quality, and the management of the studio were due to the skill, personal direction, and personal services of Purdy and Corregan. Petitioner's business could not have been carried on successfully without the services, skill, and direction of Purdy and Corregan. In addition to Corregan, petitioner employed from four to five photographers. One photographer, Wagner, has been employed by petitioner since its organization. He worked under Corregan's supervision. There was some turnover in the cameramen who were employed. *195 All were supervised by Corregan. Petitioner employed skilled workers, such as a head developer, and a head printer. The head developer in 1943, Foshey, was first employed in 1941. Corregan supervised Foshey's work three or four times a day - in the morning and in the afternoon. Purdy, also, continuously inspected proofs made by Foshey and others in the darkroom. Petitioner, in 1943, employed about 55 people during the busy season, and about 30 people during the slack season. Those employed included 6 to 8 clerks and secretaries, 10 to 12 retouchers, 3 to 4 spotters, 10 to 12 printers, 2 porters, an elevator operator, and 4 to 5 photographers, a head printer, a developer, an enlarger, and two business contact men. Some of these employees were skilled workers. Others were semi-skilled, and were trained by Purdy and Corregan. The following list shows the salaries paid by petitioner to its skilled employees: Corregan (stockholder)
$6,833.34
Purdy (stockholder)
5,133.34
Wagner (photographer)
3,301.35
Rourke (photographer)
2,735.93
Leek (photographer)
1,845.50
Hanania (head printer)
2,374.66
Ewing (enlarger)
2,757.00
Foshey (developer)
2,549.51
Bleiler (school contacts)
3,550.00
*196 The petitioner paid salaries totaling $69,928.75, of which $57,962.07 was paid to its non-stockholder employees during 1943, and $11,966.68 was paid to Corregan and Purdy, stockholders. Petitioner's net income after taxes for 1943 was about $57,412. The year 1943 was petitioner's most successful year. In the years 1934, 1935, 1936, 1938, 1944, 1946, 1948, and 1949, its books showed annual losses. It realized net profit after taxes in 1937, 1939, 1940, 1941, 1942, 1943, 1945, and 1947. The net loss and net profit after taxes were as follows: Net Profit
Year
Net Loss
after Taxes
1934
$ 6,451 $
1935
521
1936
91
1937
3,379
1938
1,979
1939
7,285
1940
4,917
1941
548
1942
26,215
1943
57,412
1944
79
1945
5,829
1946
3,150
1947
8,480
1948
12,370
1949
16,046
The petitioner used in its business cameras, lighting equipment, enlargers, developing, washing, drying, and printing equipment, and furniture and fixtures, all of which are standard equipment in the business. In 1943, the book value of these fixed assets, less depreciation were as follows: Photography equipment
$3,594.31
Furniture and fixtures
2,473.93
$6,068.24
*197 The petitioner did not sell merchandise. It purchased films, photograph paper, card-board mountings for photographs, and wooden or metal frames with glass fronts for finished photographs. These supplies are customary and they were incidental to the petitioner's portrait photography business. Some of petitioner's clients ordered either tinted enlargements or tinted miniatures of photographs and these were put in wood or metal frames with glass fronts to protect and preserve the color tinting of the pictures. Petitioner did not sell frames for pictures as such and apart from photographs. Petitioner makes photographs for from five to fifteen dollars a dozen, depending upon the size. Eighty to ninety per cent of its business consists of orders for moderately priced photographs, by the dozen, in cardboard mounts. With an order for a dozen photographs, there are given free a glossy, and a framed, untinted enlargement. If the client wants a colored enlargement or a colored miniature, there is a charge of two dollars for either, in addition to the charge for a dozen photographs in cardboard mountings, and a frame is included. A colored photograph, either an enlargement or a miniature, *198 is put in a frame with a glass front to protect the coloring and to make a finished appearance. Inexpensive frames are used. Petitioner, in 1943, did not make any profit on the frames which were included in orders. The framed photographs were given or offered to increase the volume of orders for higher priced photographs. Petitioner had no need for any borrowed capital. It could pay for supplies, materials, wages, rent, and other operating expenses out of current receipts. Petitioner, in 1943, did not need to carry an obligation of notes payable to the J. E. Purdy estate, in the amount of $4,500. It had earned surplus at the end of 1942 of about $33,000 as a result of its first very profitable year, 1942. Petitioner did not need to use its earned surplus in its business. Petitioner did not require capital in the conduct of its business. It conducted its business on a cash basis and did not extend credit. Current receipts met current expenses. Although its balance sheets show an item of accounts receivable at the end of each year, these represent only the year-end orders and portraits not yet delivered to customers. Petitioner's business is seasonal. In order to have the necessary *199 supplies of film, paper, mounts, chemicals, and frames on hand for its business seasons, petitioner purchases supplies toward the end of the year, at which time its inventory of supplies is high, and balance sheet figures are high. These supplies are used in the following year. These supplies are only what are customarily used in a portrait photograph business, and are incidental thereto. The year 1943 was a war year. There were uncertainties about deliveries and certain scarcities. In 1943, petitioner could not get metal frames, which are preferable, for pictures. Only wood frames could be obtained. Petitioner's officers bought a larger supply of wood frames in 1943 than was normal. That was done because they did not know how long the war would last and they feared scarcities. Later they sold the surplus supply of frames at a loss when metal frames could be obtained. Petitioner's officers bought an unusually large supply of Eastman photographic supplies in 1943 because they were made available by Eastman, and Eastman advised the purchases as a protection against future shortgages. Petitioner did not sell picture frames or other materials in 1943. It does not sell any merchandise. *200 Petitioner includes metal frames for enlargements and for miniatures in orders for pictures by the dozen to stimulate orders for photographs. Petitioner paid $15,000 dividends to its stockholders in 1943. The petitioner did not derive any income during 1943 from trading as a principal. Capital was not a material income-producing factor in petitioner's business in 1943. The income of the petitioner for 1943 is to be ascribed primarily to the activities of Stanley Purdy and George Corregan, Jr. The petitioner was a personal service corporation within the meaning of section 725 (a) of the Internal Revenue Code during 1943. Opinion HARRON, Judge: Petitioner has made the election under section 725 (b) of the Code to come within the definition of a personal service corporation as defined by section 725 (a). If a corporation elects to come within section 725 (a), and if it qualifies as a personal service corporation, the provisions of Supplement S of Chapter I then apply to the shareholders of the corporation. All of petitioner's shareholders have included their respective shares of undistributed Supplemental S net income in their individual returns for *201 1943. A personal service corporation is defined in section 725 (a) as "a corporation whose income is to be ascribed primarily to the activities of shareholders who are regularly engaged in the active conduct of the affairs of the corporation and are the owners at all times during the taxable year of at least 70 per centum in value of each class of stock of the corporation and in which capital is not a material income-producing factor." Respondent concedes that two of the requirements are met in this proceeding. The questions to be decided are: (1) Whether petitioner's income for 1943 is to be ascribed primarily to the activities of the shareholders, Purdy and Corregan; and (2) Whether capital was a material income-producing factor. Under both questions, the petitioner has the burden of proof. The questions to be decided are questions of fact. Farmers National Co., 13 T.C. 505, 510. The petitioner presented testimony of Purdy and Corregan, and of two employees of petitioner, one of whom has been employed by petitioner since the time it was organized in 1934. The record includes numerous exhibits which present facts about the operation of petitioner's business. The *202 respondent called no witnesses other than the revenue agent who examined petitioner's return for 1943. He has not presented any countervailing evidence, and he has not presented any evidence about the conduct of any comparable photographer's business in Boston, or elsewhere. All of the evidence and record have been very carefully examined and analyzed. Since the words employed by the Congress in the definition of a personal service corporation in section 725 (a) are words of degree, it is necessary to weigh all of the evidence with care and to consider whether the evidentiary factors preponderate in the petitioner's favor, or in the respondent's favor. In some cases, the evidence is so nearly in balance that the questions for decision are very close. Some of the decided cases appear to be difficult to reconcile. We must exercise care in distinguishing cases in which the facts are different. Each case stands on its own facts. In this proceeding, the petitioner's problem springs chiefly from the fact that in 1942 and 1943, for the first time, its volume of business, gross receipts, and earned surplus were comparatively high. That fact should not deprive petitioner of the benefit *203 of section 725 (a) if all of the evidence preponderates in its favor. Petitioner relies on Trout-Ware, Inc., 11 T.C. 505, which involved the same type business. But for differences in degree - petitioner had more employees and a larger volume of business - this proceeding is not readily distinguishable from the Trout-Ware case. Petitioner relies, also, on H. Newton Whittelsey, Inc., 9 T.C. 700; and Farnham Manufacturing Co., 13 T.C. 511, and both of these cases give petitioner support because there are facts in this proceeding which are favorable to petitioner's contention, which are of the same character as certain facts in those cases which were found to be favorable to those petitioners. We have reviewed all the authorities cited by both parties. With respect to respondent's citations, the following are clearly distinguishable on their facts from this proceeding and, therefore, do not control. Fairfax Mutual Wood Products Company, 5 T.C. 1279; Graham Flying Service, 8 T.C. 557, affd. 167 Fed. (2d) 91, certiorari denied, 335 U.S. 817; Gus Grissman Co., 10 T.C. 499. It is *204 concluded that the petitioner has met its burden of proof under both questions. (1) Relation of Income to Activities of Shareholders. Petitioner had employees who were both skilled and semi-skilled workers. Whether or not their services were so substantial as to defeat petitioner's claim that its income was "ascribed primarily" to the services of Purdy and Corregan is a question of fact. Assuming that other employees rendered substantial services, the evidence shows that the value and compensation of the skilled employees were attributable to the skill and supervision of Purdy and Corregan, and this is found in our findings of fact. See Regulations 112, section 35.725-2, (c). In this proceeding, as in Trout-Ware, Inc., supra, the shareholder employees, Purdy and Corregan, controlled the quality of all of the work. They directed and supervised all of the work; they were dominant in the organization; Corregan was responsible for getting the business; Purdy and Corregan, by their supervision, suggestions, and criticism caused their assistants and subordinates to do the work in such way as to result in a quality product. We pointed out in Farnham Manufacturing Co., supra, *205 that "the word 'primarily' and the word 'substantially' are not interchangeable equivalents" (p. 518); and in H. Newton Whittelsey, supra, we noted that the statute does not require that income must be attributed entirely to the activities of the shareholder employees. In the Whittelsey case, the hiring of a good many employees did not prevent approval of the claimed classification. In our opinion, the supervision of Purdy and Corregan was "part of the end product itself." William A. Brady Theatre Co. v. Commissioner, 42 Fed. (2d) 181, 183. The petitioner has made a prima facie case, and we hold that the income of petitioner in 1943 was "ascribed primarily" to the services of Purdy and Corregan. (2) Capital Not an Income Producing Factor. Petitioner's physical assets and all that it uses in its business are wholly incidental to the operation of the business. What petitioner "sells" is primarily skill and service. Petitioner carries on its business by the use of current receipts and accrued profits. George B. Ricaby Co. v. Nauts, 19 Fed. (2d) 271. Because of two years of increased business, petitioner for the first time had substantial *206 earned surplus, but it did not use this, or need it, in the operation of its business in 1943, and this fact does not require a holding that capital was an income producing factor in the sense that the phrase is used in section 725 (a). Alexander & Garrett v. United States, 21 Fed. (2d) 547. Upon all of the evidence we find that in 1943, capital was not an income producing factor. Petitioner is entitled to personal service corporation classification. Decision will be entered for the petitioner.