HOWARD T. LEWIS, JR., AND MARILYN N. LEWIS, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 91725. Filed August 17, 1964.

*James H. Marks, Jr.,* for the petitioners.
*Hobart Richey,* for the respondent.

FISHER, *Judge:* Respondent determined a deficiency in income tax of petitioners for the years 1954 and 1955 in the respective amounts of $13,724.94 and $12,347.28. The issue presented for consideration is whether, during the taxable years 1954 and 1955, petitioner operated an enterprise in which capital was a material income-producing factor, thereby permitting him to elect, under section 1361, Code of 1954, to have the enterprise taxed as a domestic corporation.

### FINDINGS OF FACT

The stipulated facts are found accordingly and are incorporated herein by reference.

Petitioners are husband and wife and reside at 1241 Peermont Avenue, Pittsburgh, Pa. They filed joint Federal income tax returns for 1954 and 1955 with the district director of internal revenue, Pittsburgh, Pa. Since Marilyn Lewis is a party to this proceeding only

because she filed joint income tax returns for the years involved, Howard T. Lewis, Jr., will hereinafter be referred to as petitioner.

Petitioner graduated from the University of Pittsburgh School of Medicine in 1943 and has been authorized to practice medicine in Pennsylvania since 1944.

During the years 1944 to 1947, petitioner served with the Medical Corps of the U.S. Army. In the performance of his duties as a battalion surgeon, stationed in the Philippines, petitioner contracted bulbar polio and was confined to an Army hospital for approximately 18 months.

His illness stimulated petitioner into research of methods of combating debilitating and degenerative diseases such as polio, arthritis, diabetes, heart, vascular, and obesity. Petitioner concluded that these types of diseases could best be controlled by a program of nutritional regimen. He believed that proper treatment through nutrition required, in addition to the medical evaluation of a patient's condition, the prescription of necessary drugs and the development for each patient of a regimen which must be followed strictly.

By 1950, petitioner determined that in order to correlate these requirements certain processes should be performed under his personal supervision. These processes consisted of clinical activities such as the development and maintenance of a laboratory, maintenance of inventory of drugs and nutritional supplies, and the use of treatment and lecture rooms. Petitioner uses no special equipment in his program.

Petitioner, in 1952, founded a health clinic (hereinafter referred to as the clinic). By the beginning of 1954, the physical quarters owned by petitioner and occupied by the clinic consisted of, in addition to a waiting room and administrative quarters, a laboratory, a drug department, seven treatment rooms, and a small auditorium or lecture room. The examining rooms contained the normal equipment found in medical offices, including tables, scales, medicine cabinets, blood pressure machines, etc. Petitioner also occupied the upper floors of this building as a residence. In addition, petitioner carried on his normal medical practice from this building without differentiation being made in the medical quarters.

The patient, upon beginning the program, is given a thorough physical examination and his medical history is taken. He is measured and weighed and all relative and pertinent facts are obtained. The patient is then instructed with respect to what will be provided for him as well as what is expected of him. It is petitioner's theory that there are certain treatment principles with which the patient is to abide, among which are a heavy supplemental diet with minerals and vitamins as well as other medications which generally prove expensive to the patient.

Petitioner discovered that most patients tend to place very little importance on preventive health measures and, in order to assist such patients, it was necessary to provide a method to keep them under treatment irrespective of their economic status. To accomplish this, petitioner set the cost of the program to the patient at $10 per month rather than a fee based upon the number of visits or the length of the individual program involved.

During the course of his general medical practice, petitioner, on occasion, diagnosed that his patients were suffering from certain degenerative illnesses. As a result, many of these patients began petitioner's nutritional program administered through the clinic. Petitioner preferred that his patients suffering from any of the degenerative illnesses undergo this program of treatment rather than be treated in some other manner.

The types of property owned by petitioner and employed jointly in the operation of the clinic and his general medical practice during the years 1954 and 1955 and their depreciated values are as follows:

| Assets | Date acquired | Cost of assets acquired prior to Jan. 1, 1954 | Depreciation prior to Jan. 1, 1954 | Balance Jan. 1, 1954 | Addition 1954 |
|---|---|---|---|---|---|
| Land | 1948 | $2,950.00 | | $2,950.00 | |
| Office building | 1948 | 9,173.37 | $2,109.85 | 7,063.52 | |
| Addition | 1952 | 4,917.88 | 491.80 | 4,426.08 | |
| Do | 1953 | 1,431.68 | 71.58 | 1,360.10 | |
| Do | 1954 | | | | $14,500.00 |
| Do | 1955 | | | | |
| Garage | 1948 | 790.18 | 454.37 | 335.81 | |
| Porch | 1950 | 1,500.00 | 1,050.00 | 450.00 | |
| Equipment | 1948 | 1,980.00 | 1,188.00 | 792.00 | |
| Automobile | 1952 | 2,650.00 | 1,777.78 | 872.22 | [1] (577.77) |
| Do | 1954 | | | | 2,909.57 |
| Air conditioner | 1953 | 1,750.00 | 350.00 | 1,400.00 | |
| Do | 1954 | | | | 2,916.12 |
| Rug | 1952 | 400.00 | 266.66 | 133.34 | |
| Jeep | 1950 | 600.00 | 360.00 | 240.00 | |
| Speaker system | 1953 | 193.35 | 38.67 | 154.68 | |
| Furniture and fixtures | 1954 | | | | 1,800.42 |
| Floors and cabinets | 1954 | | | | 1,007.13 |
| Drapes | 1954 | | | | 570.39 |
| Electronic system | 1954 | | | | 539.77 |
| Total | | 28,336.46 | 8,158.71 | 20,177.75 | 23,665.63 |

[1] Traded Apr. 26, 1954.

The only items used exclusively by petitioner in his general practice of medicine during 1954 and 1955 were a jeep acquired in 1950 at a cost of $600 and two automobiles, the first acquired in 1952 at a cost of $2,650 and the second acquired in 1954, upon a trade-in of the first, at a cost of $2,909.57.

During the years 1954 and 1955, the clinic purchased drugs and nutritional supplies at a cost of approximately $18,000 and $20,000 for the respective years and maintained during said period an inventory of such items of approximately $8,000 and $10,000 in value. Such drugs and supplies were dispensed without charge (other than

888

| Assets | Depreciation 1954 | Balance Dec. 31, 1954 | Addition 1955 | Depreciation 1955 | Balance Dec. 31, 1955 |
|---|---|---|---|---|---|
| Land | | $2,950.00 | | | $2,950.00 |
| Office building | $366.93 | 6,696.69 | | $366.93 | 6,329.66 |
| Addition | 196.72 | 4,229.36 | | 196.72 | 4,032.64 |
| Do | 71.58 | 1,288.52 | | 71.58 | 1,216.94 |
| Do | 725.00 | 13,775.00 | | 725.00 | 13,050.00 |
| Do | | | $23,000.00 | 191.67 | 22,808.33 |
| Garage | 79.02 | 256.79 | | 256.79 | |
| Porch | 300.00 | 150.00 | | 150.00 | |
| Equipment | 198.00 | 594.00 | | 198.00 | 396.00 |
| Automobile | 294.45 | | | | |
| Do | 646.58 | 2,262.99 | | 969.86 | 1,293.13 |
| Air conditioner | 350.00 | 1,050.00 | | 350.00 | 700.00 |
| Do | 291.61 | 2,624.51 | | 291.61 | 2,332.90 |
| Rug | 133.34 | | | | |
| Jeep | 120.00 | 120.00 | | 120.00 | |
| Speaker system | 38.67 | 116.01 | | 38.67 | 77.34 |
| Furniture and fixtures | 360.08 | 1,440.34 | | 360.00 | 1,080.34 |
| Floors and cabinets | 201.43 | 805.70 | | 201.43 | 604.27 |
| Drapes | 114.08 | 456.31 | | 114.08 | 342.23 |
| Electric system | 107.95 | 431.82 | | 107.95 | 323.87 |
| Total | 1 4,595.44 | 39,247.94 | 23,000.00 | 2 4,710.29 | 57,537.65 |

1 In 1954 approximately 18.12 percent ($832.57) of the depreciation deduction of $4,595.44 was allocated to Dr. Lewis' medical practice (as distinguished from the clinic operation).
2 In 1955 approximately 23.44 percent ($1,104.23) of the depreciation deduction of $4,710.29 was allocated to Dr. Lewis' medical practice (as distinguished from the clinic operation).

payment of the monthly overall fee) to clinic patients. During the same years the clinic paid salaries of approximately $13,400 and $13,700, for the respective years, to certain employees including a receptionist, a laboratory technician, and two nurses.

In each of the years involved, visits by clinic patients totaled in number between 8,000 and 9,000. In 1954 petitioner had total receipts of $100,214.50 from the clinic and $7,686.71 from his general practice of medicine. In 1955, the amounts were $104,319 and $10,194.75, respectively.

On January 18, 1955, petitioner filed his individual income tax return for the calendar year 1954, reporting a tax liability of $19,162.70 which, with the payment accompanying the return, was paid in full.

On February 28, 1955, petitioner filed with the Commissioner of Internal Revenue a statement entitled "Election" which contained the following language:

Howard T. Lewis, Jr., 1241 Peermont Avenue, Pittsburgh 16, Pennsylvania, elects, pursuant to Section 1361 of the Internal Revenue Code of 1954, to have so much of his income-producing activities as are not concerned with the professional practice of medicine, viz. the conduct of an unincorporated business enterprise engaged in furnishing a clinic-type health and weight control program for individuals in consideration for fixed monthly payments by the subscribers thereto, taxed as a domestic corporation, effective January 1, 1954, and irrevocably thereafter.

Petitioner filed an amended 1954 individual income tax return on April 15, 1955. This amended return disclosed a liability in the amount of $6,636 and an overpayment of $12,526.70. In a statement

attached to the amended return, petitioner requested that the overpayment be credited as follows:

To the credit of Howard T. Lewis, Jr. (Sec. 1361),
  year 1954_____ $7, 351. 18
To the credit of Dr. Howard T. Lewis and Marilyn Lewis,
  1955 estimated tax_____  5, 175. 52
                                                          _____
                                                           12, 526. 70

The net income tax assessed and paid for the taxable year 1954 by petitioner was $6,636, after subtracting $12,526.70 credited to other accounts pursuant to the request of petitioner.

Petitioner, on or before March 15, 1955, filed an application for extension of time to file an income tax return for the clinic, estimating a tax liability for such entity in the amount of $5,000. No payment accompanied the application. A notation added to the application stated as follows:

Taxpayer filed his 1954 Form 1040 on or about January 15, 1955, which return will be amended prior to April 15, 1955, to effect the taxpayer's election pursuant to Section 1361 of the 1954 Code with a resulting overpayment of 1954 tax of approximately $10,000, approximately $5,000 of which will be authorized as a credit to the 1954 account of the Section 1361 tax entity.

An income tax return was filed on September 15, 1955, for the clinic for the year 1954 disclosing a tax liability of $7,351.18, fully paid by the application of a credit.

On March 15, 1956, petitioner filed an income tax return for the clinic for the year 1955, disclosing a tax liability of $7,029.99 which was paid with the return. In April 1956, petitioner filed an individual income tax return reporting a tax liability of $7,142.07 for the year 1955, with an overpayment being shown on the return by reason of credits and payments of estimated tax.

Petitioner was assessed additional income tax for the year 1955 in the amount of $3,839.35, such amount being the difference between the tax liability reported on petitioner's 1955 individual return and payments made with respect thereto by way of estimated tax, no credit being allowed for the amount of $5,175.52 which petitioner requested be credited to his 1955 estimated tax. The assessment of $3,839.35 was paid by petitioner.

The income tax assessed and paid or credited for the taxable year 1955 by petitioner was $12,317.59. Respondent, in determining the amount of the deficiency for 1955, allowed petitioner, for his 1955 liability, credit for only $7,142.07.

The incorporation of a medical practice is unlawful under the laws of Pennsylvania. Being desirous of incorporating the clinic and its activities, petitioner placed the matter before the Pennsylvania State Medical Board. At a meeting of said board on May 26, 1955, the pur-

poses of the clinic were set forth and the board determined that there was no evidence before them to indicate that the clinic would engage in the practice of medicine. The board further stated it had nothing to act upon unless some complaint was filed with it alleging that the corporation was actually engaged in the practice of medicine.

The income produced by the clinic conducted by petitioner is produced by his personal services. None of the capital employed by petitioner in his clinic plays a material part in the production of income.

### OPINION

For the taxable years 1954 and 1955, petitioner separated the income and expenses involved in his nutritional program, referred to as the clinic, and elected to have such enterprise taxed as a corporation under section 1361.

Respondent has conceded compliance with the technical requirements of the election as well as compliance with the statute except for the language of section 1361(b)(4) [2] requiring that capital be a material income-producing factor for an enterprise to be eligible to elect under this section.

Petitioner's position as stated in his brief is as follows:

1. The income-producing activities of the Clinic are distinguishable from the income-producing activities of the general practice of medicine and the receipts do not principally represent fees for personal services.

2. The operation of the Clinic required a substantial investment in fixed assets consisting of building improvements in clinical equipment, a substantial investment in order to maintain competent technicians, and a substantial drug and nutritional supply inventory.

It is respondent's contention that the nutritional treatment program is one of personal services by a doctor of at least a medical nature in which the patient relies upon the personal reputation and experience of petitioner for his care. Respondent further argues that the assets used by petitioner in this enterprise represent only the assets normally found in a doctor's office although quantitatively the assets may be somewhat more substantial than usual because of the greater number

---

[2] SEC. 1361. UNINCORPORATED BUSINESS ENTERPRISES ELECTING TO BE TAXED AS DOMESTIC CORPORATIONS.

(b) QUALIFICATIONS.—The election described in subsection (a) may not be made with respect to an unincorporated business enterprise unless at all times during the period on or after the first day of the first taxable year to which the election applies or of the year described in subsection (f), as the case may be, and on or before the date of election—

* * * * * * *

(4) such enterprise is one in which capital is a material income producing factor, or 50 percent or more of the gross income of such enterprise consists of gains, profits, or income derived from trading as a principal or from buying and selling real property, stock, securities, or commodities for the account of others.

of patients. His position is that, under the circumstances, the assets in question contribute nothing substantial toward the production of income per se, but are merely the tools of the trade necessary for petitioner to perform his personal services. Thus, respondent asserts, none of the capital used by petitioner can be said to be material to the production of income. We agree with respondent.

In aid of interpretation, we think it appropriate to set forth at the outset that portion of section 1.1361–2, Income Tax Regs. (adopted Oct. 10, 1960), applicable to situations such as here confronting us. The part of the regulation here pertinent is section 1.1361–2(e)(2) which provides as follows:

Sec. 1.1361–2   Qualifications.

(e) *Nature of income.* (1) * * *

(2) The determination of whether capital is a material income-producing factor must be made by reference to all the facts of each case. Capital is a material income-producing factor if a substantial portion of the gross income of the business (other than income excluded from gross income of the enterprise under section 1361(i)(1)) is attributable to the employment of capital in the business conducted by the enterprise. Capital is not a material income-producing factor where gross income of the enterprise consists principally of fees, commissions, or other compensation for personal services performed by the owners or employees of the enterprise. Thus, an enterprise engaged in rendering professional services such as law, accounting, medicine, or engineering, ordinarily is not an enterprise in which capital is a material income-producing factor. On the other hand, capital is ordinarily a material income-producing factor if the operation of the business requires substantial inventories or substantial investments in plant, machinery, or other equipment.

In our following discussion of the authorities, we turn first to the case of *Fred J. Sperapani*, 42 T.C. 308 (1964). As indicated, *infra*, we think it distinguishable from the instant case, but it is the only case decided to date under section 1361 with regard to the requirement that capital be a material income-producing factor in the enterprise, and lends some color to the discussion here presented. In *Fred J. Sperapani, supra*, the taxpayer carried on a reporting business as a sole proprietorship under the name of Columbia Reporting Co. Columbia, during the years then in issue, had a plant, machinery, and equipment necessary to produce transcripts, including electric typewriters, duplicating machines, a Multilith duplicating machine, a Xerox machine, and an automobile. The contracts it held as the official and exclusive reporter for several of the larger Federal agencies also constituted a part of its capital assets. We held as follows (p. 335):

Columbia's gross income consists principally of revenues derived from the sale of transcripts to the public, and in some instances to Federal agencies. As such, its gross income does not consist of fees, commissions, or other compensation for personal services performed by the owner or employees of the enterprise, as in enterprises engaged in rendering professional services, such as law, account-

ing, medicine, or engineering.  Cf. *Farnham Manufacturing Co.*, 13 T.C. 511; *Trout-Ware, Inc.*, 11 T.C. 505; *H. Newton Whittelsey, Inc.*, 9 T.C. 700. * * *

As indicated *supra*, we think the situation in *Sperapani* is clearly distinguishable from the instant case since here petitioner does not use his equipment to manufacture a product or commodity which is to be sold to the public.  Thus, *Sperapani* is not controlling.  There are, however, cases construing analogous language as it appeared in section 200 of the Internal Revenue Acts of 1918 and 1921, sections 449 and 725 of the Code of 1939, relating to personal service corporations, section 704(e)(1) of the Code of 1954, relating to family partnerships, and its predecessors, sections 191 and 3797(a)(2) of the Code of 1939.  We will discuss two of the cases arising under earlier law which we think are significant.

A clear exposition of the essential meaning of the language considered in the instant case appears in *Fuller & Smith* v. *Routzahn*, 23 F. 2d 959 (N.D. Ohio 1927), where the court, in determining that the taxpayer was to be classified as a personal service corporation under section 200 of the Revenue Act of 1918, said at pages 963 and 965:

> The holdings of the courts, as well as of the Board of Tax Appeals, when dealing with this question, are uniform that it is not the presence of capital, but its use in earning income, that is the controlling consideration. Those holdings likewise are to the effect that the presence and use of capital, such as required to provide and maintain an office, with elaborate present-day equipment, and to pay salaries of employees, do not make capital a material income-producing factor. Such use of capital is incidental. In a modern law office, one-third of the gross income is usually absorbed in this way. * * *
>
> *          *          *          *          *          *          *
>
> The dominating purpose was to distinguish between corporations engaged in trade, merchandising, and manufacturing, in which much capital is required, and without which profits may not be earned, and corporations performing personal services, in which large capital is not usually required or necessary to its efficient conduct. The discrimination is between income earned by capital and income earned by personal effort. * * *

*Innes-Behney Optical Co.*, 7 B.T.A. 982 (1927), involved a corporation carrying on the business of optometry consisting of examining the eyes of patients and making and fitting of eyeglasses.  The company prepared and manufactured glasses for patients upon prescription from oculists and also made examinations of the eyes of customers and prepared the glasses needed from such examination.  The entire stock of the company was owned by Albert E. Innes and Fred L. Behney, who made all of the examinations, did all grinding of lenses, prepared the glasses, and made all fittings of the glasses.  One assistant who worked for the company did some work with the lenses requiring no technical knowledge or skill.  In addition, there was a

bookkeeper and a part-time janitor. A small stock of merchandise such as fieldglasses was held for sale, plus a supply of lenses and frames from which glasses were made. As of the close of the taxable years there in question, the values of the corporation's fixed assets, consisting of the merchandise inventories, furniture and fixtures, and tools and machinery were approximately $8,500 and $12,000. Gross receipts for the 2 years were $26,500 and $32,000, respectively. We held that this corporation qualified as a personal service corporation under section 200 of the Revenue Act of 1918. As to the question whether capital was a material income-producing factor, we said at page 984:

Such capital as was employed in the business was principally invested in furniture, fixtures, machinery, tools, and supplies essential to the production of eyeglasses. The small amount invested in salable merchandise was negligible and produced only about 3 per cent of the total income. The machinery and tools while necessarily involving the use of capital, were not, of themselves, income producers. They were no more than the implements with which Innes and Behney exercised the skill of their profession. The lenses and frames were not kept for sale as such and had little value until made up as eyeglasses through the services performed upon them by Innes and Behney. Even then they were of no practical value to anyone except the persons for whom they were specifically made. Independently of the personal services of Innes and Behney, the exercise of their judgment and skill, the capital employed in this business was useless as a producer of income to the petitioner. See *Appeal of Rhoades, Brownson & Kampman, Inc.,* 2 B.T.A. 194.

It is not essential to a compliance with the Act that no capital whatever be employed in the business. Few modern businesses are conducted without the use of capital in some form or other, and it can not be assumed that Congress intended any such narrow limitation. The business of the petitioner is essentially the sale of the services of Innes and Behney as skilled optometrists and opticians of high reputation. It is their ability to make and fit eyeglasses satisfactorily to the individual needs of its customers that the petitioner sells and from which it derives its income. It is a dealer in the experience and technical knowledge of these two men, just as the lawyer, the doctor and the artist, with large capital investments in libraries and tools and equipment, are dealers in the technical knowledge and service of their professions.

In considering whether, in a particular enterprise, "capital is a material income producing factor," it is necessary to examine in detail the way in which capital made its contribution to the enterprise. The mere existence of capital is not the determining factor. If this were not so, the statute would not have used the word "material."

Petitioner has no equipment not normally found in a doctor's office. He does, however, dispense drugs and nutritional supplies and maintains an inventory of such items. These drugs do not, by themselves, produce income since they are not sold to a patient but are included

within the patient's program as outlined by petitioner. Drugs and supplies produce no income without the personal service and prescriptions of petitioner.

In any event, we do not think the record supports an allocation of even an approximate amount of income to the use of the inventory of drugs and supplies or to the other assets referred to *supra*. Likewise, it fails to support a determination that the capital used was a material income-producing factor.

It is our view, based upon consideration of the entire record, that the capital used in petitioner's clinic represented only the tools of his trade and cannot be termed a material income-producing factor. See *Bryant & Stratton Commercial School, Inc.*, 1 B.T.A. 32 (1924); *H.S. Jaudon Engineering Co.*, 15 B.T.A. 161 (1929); *S. A. Conover Co.*, 6 B.T.A. 679 (1927).

The specialized technique which petitioner is attempting to bring within the ambit of section 1361 is nothing more than a specialized program for the treatment and prevention of certain types of diseases. Whether such treatment is or is not considered to be the practice of medicine is not significant here since the manner of the treatment is one of personal supervision and direction by petitioner. It is this personally conducted program developed by petitioner which was the dominant and material income-producing factor, and not capital supplied by petitioner.

We therefore sustain respondent's action in denying petitioner the election to have his clinic taxed as a corporation under section 1361.

We add for completeness that we have carefully examined the authorities cited by petitioner and do not find them here controlling. E.g., *Beulah H. Nichols*, 32 T.C. 1322, 1328 (1959).

*Decision will be entered under Rule 50.*

