DOROTHY BRUNO, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 7284–76. Filed November 20, 1978.

*Charles C. Shafer, Jr.,* for the petitioner.
*John Wendell Paul,* for the respondent.

FORRESTER, *Judge:* Respondent has determined deficiencies in petitioner's Federal income tax for the taxable years 1973 and 1974 in the amounts of $6,890.70, and $10,488.98, respectively. Concessions having been made, the only issue remaining for our decision is whether, for purposes of section 1348,[1] petitioner employs capital as a material income-producing factor in the business of writing bail bonds.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found.

Petitioner Dorothy Bruno (petitioner) resided in Kansas City, Mo., at the time the petition was filed herein. Petitioner filed her

---

[1]Unless otherwise indicated, all statutory references are to the Internal Revenue Code of 1954, as in effect during the years in question.

1973 and 1974 Federal income tax returns with the Internal Revenue Service Center, Kansas City, Mo.

During the years 1973 and 1974, petitioner operated the Bruno Bonding Co. in Kansas City, Mo., as a sole proprietorship. She was required to meet certain prescribed conditions before she could write bail bonds in State and municipal courts. When writing bonds in a Missouri State court, petitioner had to possess specific qualifications under the rules of criminal procedure, as enacted by the Missouri Supreme Court. Such rules provide, in pertinent part:

32.14 Bonds—Surety, Individual—Qualifications
An individual shall not be accepted as a surety on any bail bond taken under these Rules unless he possesses the following qualifications:
1. He shall be a reputable person, at least twenty-one years of age and a bona fide resident of the State of Missouri.
2. He shall not have been convicted of any felony under the laws of any state or of the United States.
3. He shall not be an attorney-at-law, a peace officer, a constable or a deputy constable.
4. He shall not be an elected or appointed official or employee of the State of Missouri or any county or other political subdivision thereof.
5. He shall have no outstanding forfeiture or unsatisfied judgment thereon entered upon any bail bond in any court of this state or of the United States.

32.15 Bonds—Surety, Individual—Additional Qualifications
In addition to the qualifications specified in Rule 32.14, an individual shall not be taken as a surety on any bail bond unless he shall be the owner of real estate or personal property having a *reasonable market value*, in excess of all encumbrances thereon, exemptions and all other liabilities, *at least equal to the amount specified in the bond which he proposes to execute*. In order to qualify upon the basis of real estate owned, an individual shall be the sole, legal and equitable owner thereof in fee simple and of record. If there are several sureties, the aggregate market value of real estate or personal property owned by them in excess of encumbrances, exemptions and all other liabilities, shall be at least equal to the amount specified in the bond. [Emphasis supplied.]

Petitioner had to file a monthly "general affidavit of qualification" to comply with these rules. In addition to the matters specified in Missouri Supreme Court Rules of Criminal Procedure 32.14 and 32.15, *supra*, petitioner was also required to furnish the following information in her affidavit, as prescribed by rule 32.16. It states, in relevant part:

32.16 Bonds—Surety, Individual—Affidavit of Justification—Additional Investigation—Approval
*In addition to the matters specified in Rules 32.14 and 32.15, such affidavit shall contain the following:* (1) an accurate legal description of the real estate

which the surety proposes to justify as to his sufficiency, together with a description of the improvements located thereon, and the location of the property by street address if it is located in a city or town; (2) *the latest assessed value of such property;* (3) an accurate description of the personal property which the surety proposes to justify as to his sufficiency, together with a statement as to the reasonable market value thereof; (4) a list of all bail bonds upon which he is surety and upon which his obligation remains undischarged, specifying the amount of each bond, the name of the principal or defendant, the offense charged, and the court in which such bond is pending; and (5) a statement whether or not he or anyone for his use has been promised or has received any consideration or security for his suretyship, and if so, the nature and amount thereof, and the name of the person by whom such promise was made or from whom such security or consideration was received. * * * [Emphasis supplied.]

Petitioner met the State requirement that a surety's bond must be supported by real or personal property by listing all of her solely owned real estate. This listing notwithstanding, petitioner is free to alienate or sell the real property without endangering her State qualification, provided such property is deleted from the inventory listed on subsequent monthly affidavits.

Furthermore, no limitation is imposed upon the volume of State bonds written if petitioner has listed real estate with a reasonable market value at least equal to the amount specified in the bond which she proposes to execute. In addition to the estimate of the real property's present market value, petitioner must also list on the monthly affidavit the property's assessed value as of the last assessment. For example, in April 1973, petitioner listed on her monthly affidavit an inventory of all real estate that she solely owned, consisting of 10 tracts of real estate including her personal residence. The estimated present market value of the properties was $313,950 and the assessed value was $56,440. Petitioner attached to this affidavit a listing of all bail bonds, amounting to $239,000, with the maximum bail bond written at a value of $10,000.

According to rule 32.12, a breach in a condition of a bond written by petitioner before a State court could result in a judgment of default and execution upon the bond without the necessity of an independent action. In the event, therefore, that a bond forfeiture is not set aside by the State court and petitioner fails to pay the requisite amount of the forfeiture, any real estate listed on her monthly affidavit will be subject to such

execution. However, petitioner has never lost any real estate because of a State bond forfeiture.

In addition to the State requirements, a bondsman must also comply with local ordinances governing appearances before the municipal court. To comply, petitioner must deposit cash, negotiable securities, or some combination thereof, with the director of finance in the amount of $15,000. No limit is imposed upon the amount of bonds that can be written once such a deposit has been made. Upon the forfeiture of a bail bond in municipal court, petitioner must either pay the amount of the forfeiture or lose the deposit, unless the accused is located within a 30-day period and returned to the court's jurisdiction.

Petitioner wrote State court bonds of $1,085,240 and $1,010,950 in 1973 and 1974, respectively. During the respective years of 1973 and 1974, she also wrote municipal court bonds of $570,553 and $653,866. The source of income during the years in issue was from fees collected from petitioner's clients based on a stated percentage of the bond's face amount. This was set at 10 percent for State court bonds and at 15 percent for municipal court bonds.

Petitioner's 1973 gross income, expenses, and net profits were, respectively, $199,704, $110,062.30, and $89,641.70. Similarly, in 1974, petitioner had gross income, expenses, and net profits in the respective amounts of $210,158.25, $106,163.81, and $103,994.44. Of the sums expensed, $40,213.09 in 1973, and $26,122.95 in 1974, represented expenditures that consisted solely of bond forfeitures. The percentage of bond forfeitures to total bonds written was 2.43 percent in 1973 and 1.57 percent in 1974.

To ensure a low percentage of bond forfeitures, petitioner maintains certain investigative standards developed over several decades of operation. She has an extensive master card file that identifies all former clients for whom she has acted as surety. These records serve as a source of information when investigating an accused.

In addition, petitioner prepares State and city docket sheets which contain identifying information about the accused individuals. On the day prior to the accused's trial or appearance, petitioner or her employees will contact each such accused on the docket sheet to remind him of his upcoming court date. If the accused is not located, then petitioner and her employees will

begin a thorough search by contacting the accused's attorney, friends, and relatives. When it appears that the accused has absconded or "skipped bail," petitioner must then pursue and return the recalcitrant party to the jurisdiction of the proper court or risk forfeiture of the bail.

Petitioner is able to attract clients to her business through the reputation she has established over the years. It is the nature of petitioner's bail bond business that the hours of operation are 24 hours a day, 7 days a week. To provide such service to her clients, petitioner employs seven individuals. She also has a telephone extension in her home that receives calls from the office in her absence. Such attentiveness to clients and expeditious service fosters much goodwill for petitioner's business.

The same duties are performed by petitioner as by her employees; that is, performing investigations on persons requesting bail bonds, furnishing bail bonds for acceptable risks, preparing docket sheets, calling the accused prior to their court date and, on occasion, pursuing recalcitrant accused who have absconded from petitioner's custody. Petitioner performs these duties from a single office. Tangible personal property used in petitioner's bail bond business for the years in issue amounts to $1,396.17, excluding two automobiles with a total cost basis of $13,719.95.

On her 1973 and 1974 returns, petitioner applied the maximum tax on earned income to the entire net profits derived from the bail bond business in computing her Federal income tax. Respondent determined that petitioner was not entitled to use the maximum tax on earned income for the entire net profits but, rather, was limited in her application of the maximum tax to only 30 percent of the net profits.

## OPINION

Respondent asserts that capital is a material income-producing factor in petitioner's bail bonding business thereby reducing the amount of available earned income that will qualify for the benefits of section 1348.[2] Such section provides that for years

---

[2]SEC. 1348. FIFTY-PERCENT MAXIMUM RATE ON EARNED INCOME.

(a) GENERAL RULE.—If for any taxable year an individual has earned taxable income which exceeds the amount of taxable income specified in paragraph (1), the tax imposed by section 1 for such year shall, unless the taxpayer chooses the benefits of part I (relating to income averaging), be the sum of—

beginning after 1971, the maximum tax rate on earned taxable income is limited to 50 percent.[3]

Earned income, for purposes of section 1348, means inter alia, any income which is earned income within the meaning of section 401(c)(2)(C) or section 911(b). The former section defines the term "earned income" to include gains and net earnings derived from the sale, transfer, or license of products by an individual whose personal efforts created such property. Section 911(b), on the other hand, employs the term "earned income" to describe the requisite types of compensation for personal services and to limit the portion of a proprietor's or partner's income that will qualify as earned income.

The controlling section in this case is section 911(b). Such section states:

(b) DEFINITION OF EARNED INCOME.—For purposes of this section, the term "earned income" means wages, salaries, or professional fees, and other amounts received as compensation for personal services actually rendered, but does not include that part of the compensation derived by the taxpayer for personal services rendered by him to a corporation which represents a distribution of earnings or profits rather than a reasonable allowance as compensation for the personal services actually rendered. In the case of a taxpayer engaged in a trade or business in which both personal services and capital are material income-producing factors, under regulations prescribed by the Secretary, a reasonable allowance as compensation for the personal services rendered by the taxpayer, not in excess of 30 percent of his share of the net profits of such trade or business, shall be considered as earned income.

If capital is found to be of material importance in petitioner's business of bail bonding, the statutory limitation under section

---

(1) the tax imposed by section 1 on the lowest amount of taxable income on which the rate of tax under section 1 exceeds 50 percent,

(2) 50 percent of the amount by which his earned taxable income exceeds the lowest amount of taxable income on which the rate of tax under section 1 exceeds 50 percent, and

(3) the excess of the tax computed under section 1 without regard to this section over the tax so computed with reference solely to his earned taxable income.

In applying this subsection to a taxable year beginning after December 31, 1970, and before January 1, 1972, "60 percent" shall be substituted for "50 percent" each place it appears in paragraphs (1) and (2).

(b) DEFINITIONS.—For purposes of this section—

(1) EARNED INCOME. The term "earned income" means any income which is earned income within the meaning of section 401 (c)(2)(C) or section 911(b) * * *

[3]Pub. L. 94–455, sec. 302(a) (Oct. 4, 1976), amended sec. 1348 for taxable years beginning after Dec. 31, 1976. It provides, inter alia, that the maximum tax rate of 50 percent is retained although the term "earned income" has been replaced by the more inclusive expression "personal service taxable income." This new term means any income within the meaning of sec. 401(c)(2)(C) or sec. 911(b) or which is an amount received as a pension or annuity.

911(b) will serve to exclude 70 percent of petitioner's net profits from the benefits of section 1348. Furthermore, if only 30 percent of the net profits is found to be earned income for purposes of section 1348, then said section will furnish petitioner with no tax benefit for the years in issue since the marginal tax bracket on 30 percent of her income is less than the maximum tax rate of 50 percent.[4]

Petitioner has the burden of proving that she is entitled to the tax benefits of section 1348 for the entire net profits from her business. Rule 142(a), Tax Court Rules of Practice and Procedure. Whether capital is a material income-producing factor is a factual question which must be determined from all the facts and circumstances of the case. *Rousku v. Commissioner*, 56 T.C. 548, 550 (1971).

In the case at hand, the parties are in agreement that respondent's regulation furnishes the test to determine whether capital is a material income-producing factor in a business. Section 1.1348–3(a)(3)(ii), Income Tax Regs., states:

(ii) Whether capital is a material income-producing factor must be determined by reference to all the facts of each case. *Capital is a material income-producing factor if a substantial portion of the gross income of the business is attributable to the employment of capital in the business,* as reflected, for example, by a substantial investment in inventories, plant, machinery, or other equipment. In general, *capital is not a material income-producing factor where gross income of the business consists principally of fees, commissions, or other compensation for personal services performed by an individual.* Thus, the practice of his profession by a doctor, dentist, lawyer, architect, or accountant will not, as such, be treated as a trade or business in which capital is a material income-producing factor even though the practitioner may have a substantial capital investment in professional equipment or in the physical plant constituting the office from which he conducts his practice since his capital investment is regarded as only incidental to his professional practice. [Emphasis supplied.]

---

[4]We note that if the 30-percent rule of sec. 911(b) applies, the taxpayer's net profits from a business in which capital is a material income-producing factor must be considerable in order to reap the benefits of sec. 1348. For example, if petitioner, as an unmarried individual (not a surviving spouse nor a head of household), had net profits from her business of $126,667 in 1973 and 1974, respectively, and the 30-percent rule applied, sec. 1348 would provide her no tax benefit.

Petitioner's marginal tax bracket for the years in issue does not exceed 50 percent until taxable income exceeds $38,000. Therefore, since 30 percent of $126,667 is $38,000, net profits must be greater than $126,667 for purposes of the maximum tax on earned income. In the instant case, petitioner is an unmarried individual and had net profits from her business of only $39,642 and $103,994, in 1973 and 1974, respectively. Consequently, the benefits of sec. 1348 are unavailable to petitioner if capital is found to be a material income-producing factor in her business.

This regulation, therefore, prescribes a test for determining whether capital is a material income-producing factor based upon the form of the income received and the nature of the business. Such a test is not sui generis to section 1348 but is derived from a history of analogous tax provisions. As stated in *Miller v. Commissioner*, 51 T.C. 755, 759 (1969), wherein this Court held that, for purposes of section 37, capital was not a material income-producing factor in petitioner's real estate brokerage business:

The concept in that section [sec. 911(b)] of a "trade or business in which both personal services and capital are material income-producing factors" is not unique. Analogous language appeared in section 200 of the Revenue Acts of 1918 and 1921, relating to personal service corporations; 1939 Code section 25(a)(4), containing definitions for the computation of an earned-income credit; section 704(e)(1), relating to family partnerships; and section 1361(b)(4) (now repealed), dealing with unincorporated enterprises electing to be taxed as domestic corporations. * * *

See also section 1.704–1(e)(1)(iv), Income Tax Regs., that establishes a test for materiality somewhat like that found in section 1.1348–3(a)(3)(ii), Income Tax Regs. Moreover, the legislative history underlying section 1348 supports the concept that a taxpayer who is engaged in a trade or business in which both personal services and capital are material income-producing factors must limit his earned income to 30 percent of the net profits from such trade or business. See, e.g., H. Rept. 91–413 (Part I), 91st Cong., 1st Sess. 208, 209 (1969).

Respondent contends that capital used in petitioner's business is a material factor since mandatory capital requirements are imposed by State supreme court rules and local municipal ordinances. Ownership of real estate, sufficient to enable the writing of a bail bond with a given denomination, is necessary for State bonding. Control over such real estate, however, rests with petitioner notwithstanding its listing with the State authorities for bail bond purposes. A sum of $15,000 cash or negotiable securities is the local municipal bonding requirement. These capital requirements, if viewed as costs of the business, can fairly be characterized as "start-up" costs attendant to any new business. For instance, a similar outlay of funds would arise in the case of a professional (doctor, lawyer, or accountant) who seeks to initially establish his business.

The instant case is one of first impression for this Court since

we are dealing with the question of whether capital is a material income-producing factor under section 1348. Cf. *Holland v. Commissioner*, 70 T.C. 1046 (1978) (wherein this Court did not reach the question of whether capital was a material income-producing factor under section 1348). However, we have faced the question of whether capital is a material income-producing factor in a variety of circumstances. See, e.g., *Ketter v. Commissioner*, 70 T.C. 637 (1978); *Brewster v. Commissioner*, 55 T.C. 251 (1970), affd. per curiam 473 F.2d 160 (D.C. Cir. 1972); *Rousku v. Commissioner*, 56 T.C. 548 (1971); *Miller v. Commissioner*, 51 T.C. 755 (1969); *Sperapani v. Commissioner*, 42 T.C. 308 (1964); *Lewis v. Commissioner*, 42 T.C. 885 (1964). These decisions follow the general rule that capital is a material income-producing factor if a "substantial" portion of the gross income of the business is attributable to the employment of capital in the business conducted by the enterprise. *Rousku v. Commissioner, supra* at 550–551. Respondent's regulations under section 1.1348–3(a)(3)(ii), *supra*, adhere to this same general rule.

While we recognize that the case at hand is a very close one, nevertheless, we find from the entire record that capital was not a material income-producing factor in the business of bail bonding. The form of income received by petitioner for rendering numerous personal services to each client was a fee based upon a flat percentage of the bail bond's face amount. Such fees are not unlike those received by real estate professionals from their clients upon the sale of a given parcel of real estate. See, e.g., *Miller v. Commissioner*, 51 T.C. 757 (1969).

Petitioner's business has gross income that consists principally of revenues derived from the sale of services. As such, its gross income consists of fees for personal services performed by petitioner or employees under her control and supervision, as in businesses engaged in rendering professional services, such as accounting, engineering, or real estate brokerage.

Respondent argues that such fees are not paid as compensation to petitioner for her personal services but are paid as consideration to petitioner for substituting her good name and financial solidarity to the State or municipal court for that of the accused. We disagree. It is hornbook law that a bail bondsman is a surety who agrees with the State that if the State will release the accused from custody, the surety will undertake

that the accused will appear personally at a specified time and place to answer the charge made against him. See, e.g., 8 Am. Jur.2d 817 (1963). The bond in a criminal action, therefore, is an agreement between the court and the accused and his surety. While the court will look to the surety's property in the event that the accused fails to appear at the proper time and place, it is the accused's presence in court that is the raison d'etre for the bail bondsman and not his financial wherewithal. *State v. Norton,* 347 S.W.2d 849, 856 (Mo. 1961).

We find no merit in respondent's contention that the business of writing bail bonds is analogous to the business of commercial banking. To the contrary, significant differences exist between bail bonding and commercial banking. The evaluation and selection of the risks, the character and type of collateral, and the form of compensation paid are some of the more important variations between the two businesses. The payment of interest on a bona fide debt, which represents the cost of capital and generally a valid tax deduction to the borrower, cannot be equated with the payment of a one-time fee on a judicially imposed bail bond that results in no tax consequences to the payor.

The business of petitioner is essentially the sale of services— not products—to certain individuals for a fee. Petitioner is an experienced and skilled bondsman with an outstanding reputation. Petitioner's testimony about the nature of her business, most of which went unchallenged by respondent, disclosed much about the nature of her business. It is her ability to render continuous service that petitioner sells and from which she derives business income. Her business' reputation is her chief means of attracting new clients and that reputation was built by services rendered.

The capital used in petitioner's business does not, per se, produce income. Nor is it analogous to inventory. It is the personal service of petitioner that is indispensable to the production of this income. As respondent's regulation indicates, at sec. 1.1348–3(a)(3)(ii), Income Tax Regs., a substantial capital investment in professional equipment or in a physical plant will not be fatal to a taxpayer who obtains his income from personal services since the capital investment is "regarded as only incidental to his professional practice."

Moreover, an analysis of the bail bonding business discloses

that it is the primary obligation of a bail bondsman to produce the accused at trial. It is not the bondsman's principal duty to compensate the Government against economic loss and we have so found. *Allied Fidelity Corp. v. Commissioner*, 66 T.C. 1068, 1075 (1976), affd. 572 F.2d 1190 (7th Cir. 1978). The Seventh Circuit in the *Allied Fidelity Corp.* case examined the nature of the bail bonding business that the appellant corporation engaged in and found that the contract of bail resembled more a contract to perform services than a contract of insurance (572 F.2d at 1193):

Allied's principal obligation is to produce the accused at trial. The monetary obligation is merely an assurance of, or inducement to perform that principal obligation. *United States v. Ryder*, 110 U.S. 729, 734 (1884). *Allied's contract thus resembles more a contract to perform services than a contract of insurance.* The forfeiture of the surety's bond, if the accused fails to appear, is not to reimburse the state for an economic loss but serves more as a penalty for the surety's own failure to perform. [Emphasis supplied.]

Thus, we regard petitioner's capital investment as merely incidental to her bonding business. See, e.g., *Hubbard-Ragsdale Co. v. Dean*, 15 F.2d 410 (S.D Ohio), affd. per curiam 15 F.2d 1013 (6th Cir. 1926). Compare *Sperapani v. Commissioner*, 42 T.C. 308, 335 (1964), with *Lewis v. Commissioner*, 42 T.C. 885, 891–892 (1964).

Few modern businesses are conducted without the use of capital in some form or other, and it cannot be assumed that Congress intended such a narrow reading of the term "capital" under section 1348. See generally H. Rept. 91–413 (Part I), 91st Cong., 1st Sess. 208 (1969). It was not, therefore, the State and municipal capital requirements which enabled petitioner's sole proprietorship to produce income. The income was generated through the personal efforts of petitioner. As stated in *Ketter v. Commissioner* (70 T.C. at 647), wherein this Court found, inter alia, that under section 1.704–1(e)(1)(iv), Income Tax Regs., capital was not a material income-producing factor:

Both before and after the creation of the partnership, the income depended principally on Mr. Ketter. His judgment, his experience, his integrity, his standards, his professional acumen, his reputation, and his management know-how brought in the money, whether the services were performed directly by Mr. Ketter or by others under his supervision and control. * * *

Similarly for petitioner, it was her judgment on the acceptance of certain of the accused as risks, her many years of

experience, her integrity in business dealings, her standards as evidenced by her exhaustive records on former clients, her professional acumen, her untarnished business reputation, and her managerial ability in the effective development and growth of a business, that marked this enterprise as a service business. Sec. 1.1348–3(a)(3)(ii), Income Tax Regs. Accordingly, we hold that, for purposes of the 50-percent maximum rate on earned income, petitioner does not employ capital as a material income-producing factor in the business of writing bail bonds. Because of concessions,

*Decision will be entered under Rule 155.*