RICHARD B. McGOWAN AND JOANNE McGOWAN, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
McGowan v. Commissioner
Docket No. 10001-79.
United States Tax Court
T.C. Memo 1982-65; 1982 Tax Ct. Memo LEXIS 672; 43 T.C.M. (CCH) 495; T.C.M. (RIA) 82065; February 11, 1982. Thomas I. Hara, for the petitioners. Sue A. Nelson, for the respondent. GOFFE
MEMORANDUM OPINION GOFFE, Judge: The Commissioner determined deficiencies in the petitioners' Federal income tax in the amount of $ 17,987 for the taxable year 1975 and $ 22,663 for the taxable year 1976. Due to concessions made by the petitioners, the only issue for decision *673 is whether petitioner Richard B. McGowan was engaged during the years 1975 and 1976 in a business in which capital constituted a material income-producing factor so that a maximum of 30 percent of his net profits from the business qualified as "earned income" for purposes of maximum tax computations. The facts in this case have been fully stipulated. The stipulation of facts and stipulated exhibits are incorporated herein by this reference. When the petition in this case was filed, petitioners, husband and wife, resided in Edina, Minnesota. They filed their joint Federal income tax returns for the taxable years 1975 and 1976 with the Western Region Service Center, Ogden, Utah. During the taxable years 1975 and 1976, petitioner Richard B. McGowan was engaged, through a sole proprietorship under the name of R.B. McGowan Company, in the trade or business of operating a sanitary landfill. (Hereinafter, petitioner in the singular will refer to petitioner Richard B. McGowan. Petitioner Joanne McGowan is a party herein solely by reason of filing joint Federal income tax returns with the petitioner.) Petitioner's sanitary landfill is known as "Freeway Landfill" and is located *674 in Burnsville, Minnesota. Freeway Landfill consists of approximately 166 acres of land, comprised of four contiguous tracts acquired at various times at an aggregate cost of approximately $ 220,000. Petitioner's adjusted basis in this land, reflecting special assessments thereon and capital costs associated therewith, equalled $ 232,245 for the taxable year 1975 and $ 235,647 for the taxable year 1976. Petitioner also owned various machinery and equipment used in the business of the R.B. McGowan Company on which petitioners claimed depreciation in the respective amounts of $ 32,518 for 1975 and $ 46,244 for 1976. These claimed deductions, computed under various methods of depreciation, were based on "cost or other basis" of the assets aggregating $ 280,778 for the year 1975 and $ 331,175 for the year 1976. Petitioner reported gross receipts from the landfill business of $ 575,227 for the taxable year 1975 and $ 649,057 for the taxable year 1976. The petitioners claimed various deductions against gross receipts in addition to the deductions for depreciation mentioned above. For the taxable year 1975 these various deductions amounted to $ 292,809. For the taxable year 1976 *675 these various deductions against gross receipts amounted to $ 267,139 although the petitioners have conceded adjustments to these claimed deductions in the amount of $ 8,100 based on the determination of the Commissioner. While still a teenager during World War II, the petitioner began work as a bulldozer operator for his father, who operated a black-dirt-for-sale business in Hennepin County, Minnesota. After removal of the saleable black dirt, the resultant depreciation in the earth was discovered to be appropriate as a landfull site, where solid waste and refuse could be deposited and covered over with dirt. Petitioner worked for his father in several related ventures until they had a falling out in the spring of 1954, after which the petitioner worked as a salesman of trucking equipment and as a bulldozer operator for businesses engaged in removing and selling sod and black dirt, although his continuing objective was to enter the sand and gravel business for his own account. In the mid-1950s, the petitioner learned that it is possible to locate deposits of sand and gravel in commercially usable quantities by low-level aerial surveillance, by which means he did in fact discover *676 a sizeable rock deposit. In 1956 the petitioner, together with another individual, made an effort to develop this rock deposit but was frustrated by a contract dispute. In 1958 the petitioner sought to develop a similar property located nearby. Petitioner, in association with another individual, purchased one tract of this land. They were unable to obtain a permit to mine for the rock and gravel. This low lying area was nevertheless found suitable as a dump, for which purpose it was used, and by 1964 the petitioner acquired a permit to operate the property as a landfill, this being the first site of Freeway Landfill. By 1969 this property was completely filled. Petitioner purchased the several parcels which now comprise Freeway Landfill during 1968 and 1969, in view of the impending space limitations. Freeway Landfill operates by charging depositors a fee for depositing their various items of solid refuse and rubbish. The principal source of its gross receipts during the years in question was contracts entered into by the petitioner with 150 to 200 different entities. A lesser amount of receipts came from members of the general public who deposited their own refuse. Two *677 broad categories comprised the petitioner's contract business clientele. The first included building and general contractors who required a place to deposit the product of ground excavations, building demolition debris, and broken road and highway material. Although there were fewer contracts with these businesses than with the types of businesses in the second category, discussed infra, the solid waste attributable to them constituted the greater part of the landfill's volume, in terms of weight and area. The contract prices in this category varied, depending on quantity of refuse, frequency of delivery, and the possible use of certain classes of the waste by Freeway Landfill as future cover material or in fashioning roadways over the landfill area for access to dumping areas or to deposits of cover material. The second category was comprised of trash haulers, or businesses engaged in the removal of rubbish from private residences and apartment and commercial buildings. During the taxable years in question, Freeway Landfill was open for business 24 hours a day, every day of the year. In addition to the petitioner, the landfill work force included up to seven full-time *678 employees, who generally worked 8-hour daily shifts. Salaries for the employees totalled $ 77,403 in 1975 and $ 84,534 in 1976. During each of the taxable years at issue, Freeway Landfill also employed itinerant contract labor, at a cost of $ 8,309 in 1975 and $ 3,407 in 1976. Such personnel were used to pick up loose paper, build fences, work on roadways over the acreage, and the like. The profitability of a sanitary landfill operation such as that of the petitioner is dependent upon its ability to accept and dispose of as much rubbish as possible. Accordingly, the employees of Freeway Landfill were principally charged with the tasks of compressing the incoming trash as much as possible, moving it about the acreage in such a fashion as to make optimum use of the space available, and covering the deposited debris with dirt. The petitioner and his employees performed these duties with various items of heavy equipment. In furtherance of the trash compacting and dispersal objectives, Freeway Landfill acquired, and had available during the taxable years in question, various items of machinery at a cost of approximately $ 235,000. The heavy equipment portion of the 1975 depreciation *679 schedule reflects five bulldozers, three compactors, one steam shovel, one tractor, and one loader, among other items. In addition to owning the above items, petitioner leased a truck or trucks for total rents of $ 17,725 in 1976. All of the machinery and equipment described above were acquired for purposes of the landfill business and so used during the taxable years in question. Petitioner, during each of the taxable years at issue, was on-site at least 5 days per week, engaged in both supervisory and administrative functions and, very commonly, in the same manual duties required of his employees; he typically worked a 7-hour shift. In addition, on those days when he was not on-site for a regular shift, the petitioner would necessarily perform administrative functions, such as collecting and depositing receipts, supervising employees, overseeing maintenance of heavy equipment, and ordering and procuring fuel and other supplies. During the year 1975 the petitioner used the services of a public accounting firm for purposes of income tax and payroll tax return preparation. During the taxable year 1976 petitioner retained a different public accounting firm which, in addition *680 to tax return preparation, prepared regular financial statements for petitioner's business, monitored petitioner's bookkeeping process and performed other ancillary services. In addition to the administrative and supervisory tasks enumerated above, the petitioner was responsible for negotiating the disposal contracts with the contractors and haulers. The petitioner also devoted substantial time to dealing with various environmental and other regulatory agencies with regard to his landfill operation. Petitioner treated the entire amount of his net income from Freeway Landfill on his Federal income tax returns for the taxable years 1975 and 1976 as earned income for the purposes of computing the maximum tax on earned income under section 1348. In his statutory notice, the Commissioner determined that capital was a material income-producing factor in the petitioner's business so that no more than 30 percent of the net profits from the landfill operations could be considered earned income for purposes of computing the maximum tax. The sole issue for decision is whether capital was a material income-producing factor in the petitioner's landfill business within the meaning of *681 sections 401(c)(2)(C), 911(b) and 1348. [1] Petitioner has the burden of proving the Commissioner's determination erroneous. Rule 142(a), Tax Court Rules of Practice and Procedure; Welch v. Helvering,290 U.S. 111 (1933). For the taxable years in question, section 1348 provided that the maximum tax on earned income was 50 percent. Section 1348(b)(1) adopted, for the purposes of such section, the definitions of earned income contained in sections 401(c)(2)(C) and 911(b). For the taxable years at issue section 911(b) stated in part: (b) DEFINITION OF EARNED INCOME.--For purposes of this section, the term "earned income" means wages, salaries, or professional fees, and other amounts received as compensation for personal services actually rendered * * *. In the case of a taxpayer engaged in a trade or business in which both personal services and capital are material income-producing factors, under regulations prescribed by the Secretary or his delegate, a reasonable allowance as compensation for the personal services rendered by the taxpayer, not in excess of 30 percent of his *682 share of the net profits of such trade or business, shall be considered as earned income. This definition has been amplified by section 1.1348-3(a)(3)(ii), Income Tax Regs., which provided: (3) Earned income from business in which capital is material.
(ii) Whether capital is a material income-producing factor must be determined by reference to all the facts of each case. Capital is a material income-producing factor if a substantial portion of the gross income of the business is attributable to the employment of capital in the business, as reflected, for example, by a substantial investment in inventories, plant, machinery, or other equipment. In general, capital is not a material income-producing factor where gross income of the business consists principally of fees, commissions, or other compensation for personal services performed by an individual. Thus, the practice of his profession by a doctor, dentist, lawyer, architect, or accountant will not, as such, be treated as a trade or business in which capital is a material income-producing factor even though the practitioner may have a substantial capital investment in professional equipment or in the physical plant constituting *683 the office from which he conducts his practice since his capital investment is regarded as only incidental to his professional practice. Section 401(c)(2) provided: (2) EARNED INCOME.-- (C) INCOME FROM DISPOSITION OF CERTAIN PROPERTY. -- For purposes of this section, the term "earned income" includes gains (other than any gain which is treated under any provision of this chapter as gain from the sale or exchange of a capital asset) and net earnings derived from the sale or other disposition of, the transfer of any interest in, or the licensing of the use of property (other than good will) by an individual whose personal efforts created such property. Petitioner contends that the entire amount of net income which he received from his landfill business constitutes earned income for the purposes of the maximum tax provided for in section 1348. This argument is based on the definitions of earned income contained in sections 911(b) and 401(c)(2)(C). [2] Respondent maintains that the petitioners are subject to the 30 percent limitation under section 911(b) on the amount of income considered earned income from a trade or business and that the definition of earned income contained *684 in section 401(c)(2)(C) does not apply. We will first consider petitioner's argument under the definition of earned income contained in section 401(c)(2)(C). This definition, originally arising in the context of whether an individual is an employee for purposes of determining his qualification for special tax treatment of certain deferred compensation, concerns gains or net earnings derived from property by an individual whose personal efforts created such property. The petitioner directs our attention to section 1.1348-3(a)(3)(iii), Income Tax Regs., which provides as follows: (iii) This subparagraph [concerning earned income from business in which capital is material] does not apply to gains and net earnings derived from the sale or other disposition of, the transfer *685 of any interest in, or the licensing of the use of property by an individual whose personal efforts created such property which are, by reason of subparagraph (1)(i) of this paragraph, treated as earned income. Thus, for example, a research chemist's substantial capital investment in laboratory facilities which he uses to produce patentable chemical processes from which he derives gains within the meaning of this subdivision would not be considered a material income-producing factor. Petitioner, then, maintains that the limitation on the amount of earned income where capital is a material income-producing factor does not apply with respect to net earnings derived from "licensing of the use of property by an individual whose personal efforts created such property." He maintains that this exception is obviously based upon the definitional language of section 401(c)(2)(C) which is incorporated into section 1348 by reference. Section 401(c)(2)(C) was added to the Code by section 205(a) of the Foreign Investors Tax Act of 1966, Pub. L. 89-909, 80 Stat. 1541. Prior to that time the Commissioner made a distinction as to the treatment of certain income of authors, inventors and the *686 like as earned income for retirement plan purposes based on whether or not the creative individual was or was not an employee. Congress enacted this addition to the Code for the express purpose of removing this distinction so that the gains or net earnings of authors, inventors and the like from property which they created with their personal efforts would be treated as earned income whether or not they were employees. S. Rept. 1707, 89th Cong., 2d Sess. (1966), 1966-2 C.B. 1059, 1103. Petitioner's argument that his landfill activities somehow fall within the requirements of 401(c)(2)(C) is novel. He presents this argument as follows: While petitoner can make no claim to having invented or conceived of the first garbage dump or sanitary landfill, he does maintain that his prior employment history qualified him to recognize particular real estate for its inherent values and to identify the profitable uses to which it could be put. Where others might see vacant land or a possible site for a building, petiti ner literally "saw" garbage, a societal product which could profit him individually. Having done so, his personal efforts were clearly directed to establishing *687 a property usage where nothing had previously existed and have enabled him to develop its continuing success to optimum content. The petitioner's grant to others, by contract or otherwise, of the right to enter upon his land for dumping purposes is an obvious license of the use of the property and would be so recognized under Minnesota law. While we appreciate the pride and enthusiasm with which the petitioner chooses to pursue his chosen occupation, we do not believe that his activities bring him within the definition of earned income under 401(c)(2)(C). Although petitioner has gone to great lengths to explain to us how in the past he used aerial surveillance to find land to be used as a rock quarry, and, although he has suggested, on brief, that where others might see vacant land he "saw" garbage, he has offered no evidence as to how or why he acquired the property at issue today other than that he desired to continue landfill operations near his previous location. We do not hereby suggest that such unusual forms of creative activity, were they before us, would qualify under the definition in question. The issue is not before us. The creative activities colorfully described *688 by petitioner relate to his activities in the past and have not been tied to the use of the property in question today. We will now consider today's issue in light of the definition of earned income contained in section 911(b). It is clear that petitioner has a significant investment in land, machinery and equipment and that this investment is related to his trade or business. Petitioner presents three arguments in response. First, petitioner maintains that land in the context of his business is a start-up cost, citing Bruno v. Commissioner,71 T.C. 191 (1978). Second, petitioner suggests that the numerous cases in which capital has been held to be a material income-producing factor are distinguishable from today's case in that all of these previous cases involved factual situations in which inventories were greater than or equal to 50 percent of gross receipts and greater than or equal to net profits. Petitioner suggests that he has no inventories and that he has "no product but space itself." Petitioner further maintains that his investment in land is not analogous to a physical plant or otherwise of a nature to be considered capital that is a material income-producing *689 factor in his business. Petitioner argues that his amortized investment in land is less than 10 percent of his gross profits, which he suggests is hardly substantial. To support this, he indicates to this Court that he purchased the land on a deferred payment basis, which in turn is the foundation for his investment amortization analysis. Third, petitioner laments the inequality of the 30 percent rule, arguing that petitioner has worked diligently in his business for years and should not thereby be deprived of the benefits of the maximum tax. Respondent maintains that capital is a material income-producing factor in petitioner's business. He suggests to this Court that petitioner indeed had a substantial investment in land and equipment which was required for the operation of his trade or business and is therefore not incidental, as the profitability of the business depends on such investment. Petitioner's reliance on Bruno v. Commissioner,supra, is unfounded. In that case this Court stressed that the capital used in the taxpayer's business and required by the state licensing authorities was not involved in the production of income, and was merely incidental *690 to the taxpayer's professional practice of a bail bondsperson. The facts before us clearly show that capital is a material income-producing factor in petitioner's business. Petitioner himself suggests that he has "no product but space itself." Not only is this space, his land, directly related to his production of income, it is clear that the only service he sells is the use of his land. Petitioner's analysis of the amortized value of his land is invalid. Petitioner's amortization analysis is based on the terms of his deferred payment purchase of the land. This agreement of the parties would reflect the proper amortization of the land only by accident, as it is based not on the use or value of the land but on the manner and timing in which petitioner chooses to pay for the land. Moreover, there is no litmus test whereby the use of capital in a business is compared to either gross or net earnings and the resultant ratio is considered to determine whether or not the capital is a material income-producing factor in the business. Although such a comparison might be considered evidence, when appropriate, the question of whether capital is a material income-producing factor is one *691 which must be decided on the basis of all the facts and circumstances of each case. Petitioner's final argument protects the inequality of the 30 percent limitation imposed by Congress. Such a judgment rests not in our hands but in those of Congress, see footnote 2, supra.
Decision will be entered for the respondent.
Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended.↩
2. For taxable years beginning after 1978, sec. 1348(b)(1) was amended to eliminate the 30 percent limitation on earned income derived from a trade or business in which capital was material. Rev. Act of 1978, Pub. L. 95-600, sec. 442(a), 92 Stat. 2763, 2878. Sec. 1348 has been repealed for taxable years after 1981. Economic Recovery Tax Act of 1981, Pub. L. 97-34, sec. 101(c)(1), 95 Stat. 172, 183.↩